UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
EVELYN GONZALEZ,

                        Plaintiff,

                                                **MEMORANDUM & ORDER**

            -against-
                                                06 CV 761 (RJD) (LB)

NEW YORK CITY TRANSIT AUTHORITY
and MANHATTAN AND BRONX SURFACE
TRANSIT OPERATING AUTHORITY,

                        Defendants.
-----------------------------------------------------------X
DEARIE, Chief Judge.

Plaintiff *pro se*, a Hispanic woman employed by the Manhattan and Bronx Surface

Transit Operating Authority ("MaBSTOA"), filed three complaints against MaBSTOA and the

New York City Transit Authority ("NYCTA" or "Transit Authority"), alleging race and gender

discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C.

§ 2000e *et seq.* ("Title VII"). Plaintiff claims that defendants' failure to promote her constituted

unlawful discrimination. She further alleges that defendants retaliated against her by improperly

excluding her from work during a union strike, by refusing to interview her for two positions for

which she applied, and by amending a notice of vacancy for a third job so as to render her

ineligible for the position. Plaintiff's complaints were consolidated into this single action.

Defendants now move for summary judgment pursuant to Rule 56 of the Federal Rules of Civil

Procedure. For the reasons set forth below, the Court grants summary judgment for defendants

on all of plaintiff's claims.

# BACKGROUND[1]

## A.    Plaintiff's Educational Background

Plaintiff holds an associate's degree in legal studies and an "executive secretarial" associate's degree. Pl.'s August 11, 2006 Dep. ("Pl.'s Aug. 11, 2006 Dep.") 14, 19.  She has not received a bachelor's degree. Pl.'s December 14, 2006 Deposition ("Pl.'s Dec. 14, 2006 Dep.") 31. Plaintiff does not hold any professional licenses, and has received no other professional training. Pl.'s Aug. 11, 2006 Dep. 19-20.  She has never taken a civil service exam. Pl.'s Dec. 14, 2006 Dep. 31.

## B.    Plaintiff's Early Employment with Defendants

Although plaintiff worked in NYCTA's Law Department and Office of Labor Relations, she has in fact been an MaBSTOA employee during her entire career. Defs.' Statement ¶ 3; Brown Aff. ¶ 7.[2]  Plaintiff began her employment in NYCTA's Law Department in October 1997, as a Technical Support Aide ("TSA"), Level II.  In September 1998, plaintiff became a TSA Level III.  In March 2000, plaintiff transferred to the position of Special Inspector in NYCTA's Office of Labor Relations.  Plaintiff's duties as a Special Inspector included

---

[1] Unless otherwise noted, the facts described here are undisputed.  Plaintiff did not submit a response to Defendants' Local Rule 56.1 Statement of Material Facts as is required. Nonetheless, taking into account plaintiffs' *pro se* status, the Court exercises its discretion and looks to the factual allegations contained in plaintiffs' response, complaint, deposition testimony, and other submissions, and deems admitted only those of defendants' statements that plaintiff nowhere contests. Holtz v. Rockefeller & Co., Inc., 258 F.3d 62, 73 (2d Cir. 2001).

[2] MaBSTOA and NYCTA are separate legal entities. Defs.' Statement ¶ 1.  In order to be employed by NYCTA, an applicant must pass a civil service exam. Id. ¶ 2.  As noted, plaintiff has never taken a civil service exam, and she is therefore ineligible for employment with NYCTA. Pl.'s Dec. 14, 2006 Dep. 76.

investigating employee sick leave abuse and theft of service, as well as field work, undercover investigations, and working with attorneys. Pl.'s Aug. 11, 2006 Dep. 27. She was represented in all of these positions by the Transport Workers Union ("TWU"), Local 100.

Plaintiff's first change in title—which defendants characterize as a "promotion" and plaintiff calls a "step-up"—entailed a salary increase. Id. at 23. Plaintiff contends that this increase was subsequently rescinded. Plaintiff's move to the Office of Labor Relations also brought a salary increase. Id. at 26. Again, however, plaintiff maintains that this raise was rescinded one month after being granted. Pl.'s Opp. ¶ 10.

At some time between September and December of 2001, plaintiff applied for a Claim Examiner position in the Law Department. Lloyd Bernhardt, a supervisor in the Law Department, interviewed her. Around the same time, plaintiff encountered disciplinary problems in the Office of Labor Relations. Despite her perception to the contrary, it is clear from the record, as summarized below, that plaintiff did not receive the Claim Examiner position.

## C.      Plaintiff's Disciplinary Problems and Return to the Law Department

In October 2001, plaintiff received a "Disciplinary Action Notification" regarding unsatisfactory performance of her job duties. The charges against her related to insubordination and other misconduct allegedly committed in September 2001. Plaintiff appealed the disciplinary charges through her union. After a hearing, plaintiff, her union representative, and NYCTA executed a Stipulation and Agreement ("Stipulation") on December 5, 2001, to resolve the dispute. The Stipulation provided, inter alia, that the disciplinary specifications against plaintiff were sustained; that the suspension of record against plaintiff would be modified from

3

thirty to ten days; that the suspension would remain part of plaintiff's record for eighteen months, but would be expunged after that period if plaintiff was not found guilty of any similar misconduct; and that plaintiff would "return immediately to her former title in the Law Department." Pl.'s Aug. 11, 2006 Dep., Ex. C.

Plaintiff signed the Stipulation without reading it and does not recall hearing that she would return to the Law Department until some time thereafter. Pl.'s Aug. 11, 2006 Dep. 57-59. Later, plaintiff claims she read the Stipulation and understood it to mean that she would resume her former title in the Law Department for eighteen months. However, she thought that the entire agreement would expire and that she would become a Claim Examiner after the eighteen-month period elapsed. Id. at 64. In addition, plaintiff appears to have believed that her return to the Law Department was part of a normal hiring process, rather than a stipulated resolution of a labor dispute. While plaintiff was interviewed for a Claim Examiner position in the Law Department in late 2001, there is no evidence in the record that she was hired as a result of this interview. Nonetheless, in a March 22, 2005, email to NYCTA president Lawrence Reuter, she wrote that she had been "interviewed and hired" for the Claim Examiner position in 2001. Hyland Dep. Ex. 5. Kevin Hyland, NYCTA Vice President of Human Resources, disputed this claim in an April 4, 2005 letter to plaintiff, in which he wrote that plaintiff was returned to her position as a TSA III in the Law Department pursuant to the Stipulation. Id. Ex. 2.[3]

---

[3]Wallace Gossett, head of NYCTA's Torts Division, testified that in late 2001a Law Department employee told him that plaintiff "was about to be fired" and asked him to employ her in the Torts Division and that he agreed. Gossett Dep. 6-7. Plaintiff, however, testified that Lloyd Bernhardt interviewed her in late 2001 for a position in the Law Department. Pl.'s Aug. 11, 2006 Dep. 50-51. Michael Francese, plaintiff's supervisor, also testified that Bernhardt interviewed plaintiff, and that Bernhardt first told Mr. Francese that plaintiff would be working for him. Francese Dep. 10-12. However, these accounts are not necessarily inconsistent. It may be that plaintiff applied and interviewed before the disciplinary dispute arose, or it may be that

In any case, plaintiff returned to the Law Department in her prior role as a TSA III on December 10, 2001. Pl.'s Aug. 11, 2006 Dep. 66. Although she claims otherwise in her opposition papers, she acknowledged at her deposition that Level III is the highest level in the TSA position. Compare Pl.'s Dec. 14, 2006 Dep. 40 with Pl.'s Opp. ¶ 27. After she returned to the Law Department, plaintiff's job duties remained essentially the same through the commencement of this action. Pl.'s Aug. 11, 2006 Dep. 68. While the parties dispute to some extent the details and characterization of plaintiff's duties, her primary functions related to the investigation and resolution of property damage claims. Id. at 66; Defs.' Statement ¶ 25. Plaintiff claims that she carried out investigations with relative independence, whereas defendants generally characterize her duties as clerical. Plaintiff also maintains that she performed the job duties of a Claim Examiner or Claim Specialist, despite having the title of TSA. See, e.g., Pl.'s Dec. 14, 2006 Dep. 40.

**D.    Plaintiff's Early Attempts to Advance within the Law Department**

In December 2003, plaintiff emailed Brenda Coleman, Senior Director of Administration and Budget in the Law Department, to inquire about the status of her 2001 application for the Claim Examiner job. Coleman referred plaintiff to Wallace Gossett, head of the Law Department's Torts Division, who met with plaintiff shortly thereafter. Gossett told plaintiff that she would not be promoted at that time, but would perhaps be promoted in the future.

In December 2004, plaintiff emailed Kevin Hyland, NYCTA's Vice President of Human Resources, noting that she had "transferred to the Law Department as a Claims Specialist," and

---

Mr. Gossett instructed Mr. Bernhardt to interview her before agreeing to her stipulated transfer.

5

that "at the time of the transfer, [she] couldn't go into [her] promotional title because a freeze was in effect at the time." Pl.'s Aug. 11, 2006 Dep. Ex. G.[4] Joseph Brown, NYCTA's Director of Human Resources, subsequently called plaintiff and asked her to send him her resume, which she did. Brown requested a short description of plaintiff's job duties from Brenda Coleman and Michael Francese. Danielle Ruttman, Deputy Executive Assistant General Counsel of the Law Department, responded to this request on December 22, 2004. At Francese's request, Ruttman wrote a memorandum to Gossett in April 2005 regarding plaintiff's prospects for promotion. Ruttman reported that plaintiff was "very conscientious and her work product [was] good;" that plaintiff had "limited investigation training by accompanying Claim Examiners in their field investigations;" and that Francese "support[ed] the effort to promote [plaintiff] to a Claim Examiner title." Id. On May 19, 2005, Brown wrote an email to Coleman which stated:

> Currently Ms. Gonzalez is a Tech. Support Aide III ([MaBST]OA) with a salary of $35,680. She works in a unit that consist (sic) of only [NYC]TA employees working in the title of Claims Specialist. There is no equivalent title on the OA side. In order to get her into a title that is more related to her current responsibilities I would recommend the title of Senior Claims Examiner (OA216) if she's qualified. However, because her current and proposed titles have equivalent salary ranges this could only be a lateral transfer. The next level up would be Supervising Claims Examiner, but she would need supervisory experience.

---

[4] Plaintiff was under the impression that she was to be promoted (or had in effect already been promoted), but had to wait until the hiring freeze was lifted. When asked at her deposition what formed the basis for her belief that she was to be promoted, plaintiff said, "They told me at the time that there was a freeze." Pl.'s Aug. 11, 2006 Dep. 64. However, plaintiff testified that when, in 2001, she asked Joseph Brown, NYCTA Director of Human Resources, whether she would be promoted to Claim Examiner, he told her there was a hiring freeze and nothing more. Id. at 65-66. Plaintiff also testified that in 2005, Brenda Coleman told her that she had received a promotion but it could not take effect because of a hiring freeze. Id. at 114-115. Coleman denies having made this statement, Coleman Dep. 27, though she admitted that she may have told plaintiff at some time that she had received a promotion within the Law Department, id. at 28.

Brown Dep. Ex. 11.

On or about June 8, 2005, Coleman met with plaintiff and offered her the title of Claim Examiner. Plaintiff testified that Coleman offered her the title with "less money," Pl.'s Dec. 14, 2006 Dep. 39, whereas Coleman claims she told plaintiff the change in title would not entail a decrease in salary, Coleman Aff. ¶ 8. However, it is clear that, had plaintiff accepted the title of Claim Examiner, she would not have received any increase in pay, because defendants' compensation policy provided for a pay increase for a lateral change in title only if the minimum pay rate for the new title exceeded the minimum pay rate for the old title by at least eight percent. Brown Aff. ¶¶ 7-8, Ex. A. Because the title offered did not meet this requirement, plaintiff would have received no raise. Ultimately, plaintiff did not accept the Claim Examiner position.

On June 13, 2005, plaintiff filed a complaint with the New York State Division of Human Rights ("SDHR"), charging NYCTA with race and gender discrimination. Plaintiff claimed that she was performing the duties of a Claim Examiner without earning a Claim Examiner's salary, and that Stacy Killings, an African-American man, had recently been hired as a Claim Examiner at a salary higher than hers. She subsequently amended her complaint to include MaBSTOA as a respondent.

On or about October 21, 2005, defendants posted a Job Vacancy Notice ("JVN") for a Supervising Claims Fraud Investigator position. Plaintiff applied for this position, but was not interviewed. Harry "Hank" Strawn, a white male, was hired for the position. James Manning, Director of the Special Investigations Unit, made the decision to promote Mr. Strawn.

### E.     The TWU Strike

On December 20, 2005, NYCTA and MaBSTOA employees who were members of the
Transit Workers Union went on strike.  The day before the strike, Danielle Ruttman had been
told by personnel distributing building passes that TWU members would not be allowed into the
building during the strike.  Later that day, Ruttman held a meeting with the Claims
Investigations Unit.  At the meeting, she told plaintiff that plaintiff would not be allowed into the
building during the strike because she was a member of TWU.  No other TWU Local 100
members were present at the meeting.  Indeed, plaintiff was the only TWU Local 100 employee
in the Torts Division.  Two TWU members were allowed to report to work in plaintiff's building
after the strike began on December 20.  However, these individuals were employees of Rapid
Transit Operations and did not report to Ruttman.  Ruttman Dep. 24-25.  The next day, plaintiff
received a telephone message from Michael Francese informing her that she could in fact report
to work during the strike, and she did so on December 22, 2005.  Plaintiff was fined two days'
pay for each day of work she missed during the strike under New York State's Taylor Law.
Plaintiff appealed this penalty through the TWU.  In March 2007, NYCTA informed plaintiff
that her objection to the penalties was sustained and any deductions from her compensation
would be refunded.

### F.     Plaintiff's Further Attempts to Advance

On or about February 10, 2006, defendants posted a JVN for a Claims Fraud Investigator position. Plaintiff applied for the job, but did not receive an interview. Kenneth Lauber, a white male, was hired for the position. James Manning made the decision to hire Lauber.

On February 22, 2006, plaintiff filed her first complaint in this Court ("Feb. 22, 2006 complaint"). The complaint incorporates the allegations of discrimination made in her first SDHR charge, and alleges specifically that the discriminatory acts of which plaintiff complained occurred on June 8, 2005. It also sets forth a claim that plaintiff's exclusion from work during the TWU strike constituted retaliation in violation of Title VII.

Plaintiff filed a second SDHR charge on April 11, 2006. After receiving a right-to-sue letter, she filed her second federal complaint on May 10, 2006 ("May 10, 2006 complaint"). This complaint alleges that defendants retaliated against plaintiff, in violation of Title VII, by failing to interview her for the Supervising Claims Fraud Investigator position posted in October, 2005, or for the Claims Fraud Investigator position posted in February, 2006.

On or about June 2, 2006, defendants posted a JVN for a Claim Specialist position. Plaintiff applied and was interviewed for this position, but was not selected. The JVN indicated that both "OA" (meaning MaBSTOA) and "TA" (meaning NYCTA) employees were eligible to apply for the job. On July 17, plaintiff sent Joseph Brown an email inquiring about the status of her application. She wrote, "I understand that there is a list out" (meaning that a Civil Service list existed for the position). Brown Dep. Ex. 18. When a Civil Service list exists for a particular job vacancy, it means that only NYCTA employees (viz., those who have passed a Civil Service exam) can apply for the position. Brown Aff. ¶ 4. After receiving plaintiff's email, Brown confirmed that there was a Civil Service list for the job in question, and he

informed plaintiff via email that only NYCTA employees were eligible. On July 24, Brown sent

a letter to all applicants, including plaintiff, in which he stated that the June 2 JVN "was

erroneously posted with both a New York City Transit (TA) and a MaBSTOA (OA) designation.

However, the position is exclusively TA and therefore not a promotional or transfer opportunity

for MaBSTOA employees." Brown Dep. Ex. 20. Attached to the letter was an amended JVN

indicating that only NYCTA employees were eligible for the job. Martha Mendez, an Hispanic

woman, received the Claim Specialist position.

On September 1, 2006, plaintiff filed a third SDHR charge, which she subsequently

incorporated into a third federal complaint. That complaint, filed on October 11, 2006 ("October

11, 2006 complaint), alleges that defendants retaliated against her by posting the June 2006

Claim Specialist position with an OA designation and subsequently amending the JVN to reflect

only NYCTA eligibility.


### DISCUSSION

Plaintiff filed three separate complaints, which have been consolidated into a single

action. The Court must "read [*pro se* plaintiff's] papers liberally, and . . . interpret them to raise

the strongest arguments that they suggest." Burgos v. Hopkins, 14 F.3d 787, 790 (2d. Cir.

1994); see also McEachin v. McGuinnis, 357 F.3d 197, 200 (2d Cir. 2004) ("When the plaintiff

proceeds *pro se* . . . a court is obliged to construe his pleadings liberally, particularly when they

allege civil rights violations."). Accordingly, the Court interprets plaintiff's complaints as

setting forth the following claims. Her February 22, 2006 complaint alleges that defendants

discriminated against plaintiff on the basis of her race and gender by denying her the

promotional and salary opportunities enjoyed by (1) an African-American male, Stacey Killings, and (2) an African-American female employee, Helen Smart; and that defendants are guilty of (3) discrimination as a result their failure to grant her a promotion with a corresponding raise in salary. The February 22, 2006 complaint also contains a claim that (4) defendants retaliated against plaintiff for filing a discrimination charge with the SDHR by improperly excluding her from work during the TWU strike. The May 10, 2006 complaint claims that defendants' failure to interview plaintiff for the Supervising Claims Fraud Investigator and Claims Fraud Investigator positions for which she applied constituted (5) retaliation. Finally, plaintiff's October 11, 2006 complaint presents (6) a retaliation claim based on defendants' erroneous posting of the Claim Specialist position as OA-eligible. The Court will consider each of plaintiff's discrimination claims in turn before addressing her retaliation claims.

## A.    Summary Judgment Standard

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits . . . show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "Only when no reasonable trier of fact could find in favor of the nonmoving party should summary judgment be granted." White v. ABCO Eng'g Corp., 221 F.3d 293, 300 (2d Cir. 2000) (quoting Taggart v. Time, Inc., 924 F.2d 43, 46 (2d Cir. 1991)).

In deciding a motion for summary judgment, a court "must first resolve all ambiguities and draw all inferences in favor of the non-moving party . . . ." Graham v. Long Island R.R., 230 F.3d 34, 38 (2d Cir. 2000). However, in opposing a motion for summary judgment, the

11

nonmoving party "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible, or upon the mere allegations or denials of the adverse party's pleading." Goenaga v. March of Dimes Birth Defects Found., 51 F.3d 14, 18 (2d Cir. 1995) (quotation marks and citation omitted). Rather, the nonmoving party must "set forth specific facts showing that there is a genuine issue of fact for trial." Fed. R. Civ. P. 56(e).

## B.     Race and Gender Discrimination

### 1.     Applicable Law

Title VII of the Civil Rights Act of 1964 provides in relevant part that:

> [i]t shall be an unlawful employment practice for an employer . . . to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.

42 U.S.C.§ 2000e-2(a). To establish an unlawful employment practice, a plaintiff must show "that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice." Id. at § 2000e-2(m).

In McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), the Supreme Court set forth a three-part burden-shifting scheme for Title VII cases alleging discriminatory treatment. The plaintiff's initial burden is to establish a *prima facie* case of discrimination. Plaintiff may establish a *prima facie* case of Title VII disparate treatment by showing: "1) that [s]he belonged to a protected class; 2) that [s]he was qualified for the position [s]he held; 3) that [s]he suffered an adverse employment action; and 4) that the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent." Feingold v. New York, 366

F.3d 138, 152 (2d Cir. 2004); see also Collins v. New York City Transit Auth., 305 F.3d 113, 118 (2d Cir. 2002). The McDonnell Douglas Court went on to note that "[t]he facts necessarily will vary in Title VII cases, and the specification above of the *prima facie* proof required from respondent is not necessarily applicable in every respect in differing factual situations." Id., at 802 n. 13. The burden of establishing a *prima facie* case under Title VII "is not onerous, and has been frequently described as minimal." Scaria v. Rubin, 117 F.3d 652, 654 (2d Cir. 1997). "Establishment of the *prima facie* case in effect creates a presumption that the employer unlawfully discriminated against the employee." Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 254 (1981).

Where the plaintiff succeeds in establishing a *prima facie* case of discrimination, "[t]he burden then [shifts] to the employer to articulate some legitimate, nondiscriminatory reason for the employee's rejection." McDonnell Douglas, 411 U.S. at 802. "If defendant carries this burden of production, the presumption . . . is rebutted, and the factual inquiry proceeds to a new level of specificity." Id. at 255. The plaintiff must then "demonstrate that the proffered reason was not the true reason for the employment decision . . . . She may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." Id. at 256.

### 2.     The February 22, 2006 Complaint

#### a.     First Claim

Plaintiff's first claim is that defendants discriminated against her by hiring Stacey Killings, an African-American male, for the Claims Examiner position instead of her.

13

Defendants respond that this claim is time-barred. For the reasons stated below, the Court agrees.

"In states such as New York that have an agency with the authority to address charges of discriminatory employment practices, the statute of limitations for filing a charge of discrimination with the EEOC is 300 days." Butts v. City of New York Dep't of Housing Preservation and Dev't, 990 F.2d 1397, 1401 (2d Cir. 1993). The clock begins running on such a claim when "the alleged unlawful employment practice occurr[s]." 42 U.S.C. § 2000e-5(e). According to the NYCTA's letter in response to plaintiff's NYSDHR complaint, Mr. Killings was "appointed" to NYCTA as a Claims Specialist I[5] in the Torts Division on March 8, 2004. Feb. 22, 2006 complaint 15. Plaintiff has not offered any evidence challenging or contradicting this assertion. Her statement that the most recent date of discrimination was June 8, 2005, appears to relate to the offer of the Claim Examiner position without a corresponding raise and therefore does not appear to be directly related to this particular claim. Plaintiff filed her first complaint with the NYSDHR on June 13, 2005, more than one year after Killings was hired. As a result, plaintiff's first claim alleging discrimination as a result of defendants' hiring of Killings is time-barred.

### b.    Second Claim

Plaintiff's claim based on the promotions of Helen Smart is also time-barred. The Court reads plaintiff's pleadings as alleging discrimination as a result of defendants' promotion of Smart and not her. Plaintiff first mentioned Smart in her September 24, 2004 response to

---

[5] It is not entirely clear whether "Claims Specialist" and "Claims Examiner" are different names for the same position. The Court assumes for the purposes of this analysis that they are, while noting that this assumption is not dispositive.

defendant's rebuttal of her NYSDHR complaint. Feb. 22, 2006 complaint 20-21. In that response letter, plaintiff mentions a series of "step[s] up" and promotions that Ms. Smart received between December 2000 and January 2004. Even if the Court were to construe this claim to date back to plaintiff's original June 13, 2005 SDHR complaint, none of the incidents mentioned fall within the applicable 300-day window.

### c.    Third Claim

Plaintiff's third claim stems from the fact that when she was finally offered a job as a Claims Examiner in June of 2005, the job offer was not accompanied by a corresponding raise in salary. The Court construes this claim as one of discrimination under a theory of disparate treatment. Plaintiff admits having declined the position. Rather than reapply, plaintiff filed a complaint with the SDHR. The reference in her complaint to June 8th, 2005, as the date when the "most recent or continuing discrimination took place" likely refers to this incident. Plaintiff filed her first complaint with the SDHR one week later. This claim, therefore, is timely.

Plaintiff may establish a *prima facie* case of Title VII disparate treatment by showing that she belonged to a protected class, that she was qualified for the position she held, that she suffered an adverse employment action, and that the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent. Feingold, 366 F.3d at 152. Plaintiff, who is Hispanic, satisfies the first element. Moreover, it is clear from Francese's recommendation, as well as Coleman's eventual decision to offer the position of Claim Examiner to plaintiff, that she was qualified for the position.

Plaintiff alleges disparate treatment as a result of defendants' failure to offer her a raise in association with the Claim Examiner position. The Second Circuit has recognized that

"[e]mployment actions that have been deemed sufficiently disadvantageous to constitute an adverse employment action include 'a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation.'" Williams v. R.H. Donnelley, Corp., 368 F.3d 123, 128 (2d Cir. 2004) (quoting Galabya v. New York City Bd. of Educ., 202 F.3d 636, 640 (2d Cir. 2000) (ellipsis in original)). Plaintiff asserts that she was offered the Claims Examiner position with "less money," Pl.'s Dec. 14, 2006 Dep. 39, while Coleman asserts that she told plaintiff that the change would not entail a decrease in salary, Coleman Aff. ¶ 8.

Plaintiff's allegation, even if true, does not constitute an adverse employment action. If plaintiff's allegation is true, the Claim Examiner job would not have led to a material loss of benefits. While it has been held that "[a] lateral transfer that does not result in a reduction in pay or benefits may be an adverse employment action so long as the transfer alters the terms and conditions of the plaintiff's employment in a materially negative way," Patrolmen's Benevolent Association of City of New York v. City of New York, 310 F.3d 43, 51 (2d Cir. 2002), in this case the transfer was not compelled and plaintiff's employment was not altered in a material way. As evidenced by plaintiff's decision to decline it, the Claims Examiner position was not imposed upon her. After declining to accept the position, plaintiff maintained all of her preexisting material benefits and responsibilities. Plaintiff was not fired or demoted. Nor did defendants' offer of the Claim Examiner position constitute a less distinguished title or diminished material responsibilities. "An adverse employment action is one which is 'more disruptive than a mere inconvenience or an alteration of job responsibilities.'" Feingold, 366

16

F.3d at 152 (citing <u>Galabya v. New York City Bd. of Educ.</u>, 202 F.3d 636, 640 (2d Cir.2000)). Interpreting the evidence in the light most favorable to the non-moving party, it is clear that plaintiff has failed to allege an adverse employment action.

Even if defendants' action were construed as an adverse employment action, plaintiff has failed to demonstrate that this action occurred under circumstances giving rise to an inference of discriminatory intent. Inherent in plaintiff's allegation of discrimination is an assumption that defendants chose to offer her the Claim Examiner position at a lower salary than they otherwise could or would have if she had not been a Hispanic woman. In their response to plaintiff's NYSDHR complaint, however, defendants' cite MaBSTOA's "Compensation Manual for Non-Managerial, Career and Salary Employees" ("Compensation Manual"), to explain that they in fact had no choice as to the matter.[6] According to the Compensation Manual, for MaBSTOA employees represented by a union, such as plaintiff, "a promotion is generally defined as a move to another title in the direct line of promotion, or from one Career and Salary title to another whose minimum rate exceeds the minimum rate of the employee's current title by at least 8 percent." Feb. 22, 2006 Complaint 14. Defendants go on to state that, "the Claims Examiner title is not in the direct line of promotion from Technical Support Aide," and that the difference

---

[6] With regard to this argument, the Court adopts the footnote from <u>Collins v. New York City Transit Authority</u>, noting that it "may be viewed either as an attack on appellant's showing of an inference of discrimination or retaliation in the prima facie case or as an attack on plaintiff's satisfaction of the subsequent requirement that a proffered legitimate reason for an employment action be shown to be pretextual. Because issues of this nature tend to collapse as a practical matter under the <u>McDonnell Douglas</u> framework, we treat the Transit Authority's defense as an attack on appellant's prima facie case. By doing so we do not mean to preclude treatment of such a defense as an attack on a claim of pretext." 305 F.3d 113, 119 n.1 (2d Cir. 2002) (internal citations omitted).

in "minimum salary rate" between the two positions is less than eight percent.[7] Brenda Coleman, the Senior Director of Administration and Budget within NYCTA's Law Department, testified that, after offering plaintiff the position of Claims Examiner, she told plaintiff that Human Resources had advised her that under these guidelines plaintiff would not receive a pay increase. Coleman Dep. 52-55. This testimony is supported by that of Joseph Brown, Director of Human Resources for the NYCTA, who referred to the same guidelines when he explained his May 19, 2005 recommendation to Ms. Coleman that plaintiff could only be offered a "lateral transfer" to Senior Claims Examiner. Brown Dep. 28-30.

Plaintiff responds to defendants' submission by asserting that the Compensation Manual cited by defendants applies to a contract with Transport Workers Union Local 106, and is different from the Manual that applies to her as a clerical worker represented by Local 100. Feb. 22, 2006 complaint 21. However, she has failed to explain how those manuals differ, or offer a copy of the appropriate manual into evidence. While the Court judges a *pro se* plaintiff's pleadings by a more lenient standard, "proceeding *pro se* does not otherwise relieve [plaintiff] from the usual requirements of summary judgment." McMillan v. Examination Mgmt. Servs., No. 94 CV 2229, 1996 WL 551725, at *5 (S.D.N.Y. Sep. 27, 1996); see also Lee v. Coughlin, 902 F. Supp. 424, 429 (S.D.N.Y. 1995) (holding that a "*pro se* party's bald assertion, completely unsupported by evidence, is not sufficient to overcome a motion for summary judgment." (quotations omitted)). Plaintiff has failed to demonstrate that defendants' action constitutes an adverse employment action, or to persuade the Court that defendants' actions occurred under

---

[7] "The minimum salary rate for MaBSTOA Technical Support Aide III is $35,370, and the minimum salary rate for MaBSTOA Claims Specialist I is $31,547." Feb. 22, 2006 Complaint 14.

18

circumstances giving rise to an inference of discriminatory intent. As a result, the Court grants summary judgment as to plaintiff's third discrimination claim.

## C.    Retaliation

The Court construes plaintiff's complaints to present four distinct claims of retaliation. The Court briefly describes the relevant standards for evaluating these claims and then analyzes each in turn.

### 1.    Applicable Law

"The allocation of burdens of proof in retaliation cases follows the general rules enunciated by the Supreme Court in McDonnell Douglas Corp. v. Green." Reed v. A.W. Lawrence & Co., Inc., 95 F.3d 1170, 1178 (2d Cir. 1996). To establish a *prima facie* case of retaliation, a plaintiff must demonstrate that: "(1) the employee was engaged in protected activity; (2) the employer was aware of that activity; (3) the employee suffered an adverse employment action; and (4) there was a causal connection between the protected activity and the adverse employment action." Id. As with discrimination claims under Title VII, if a plaintiff succeeds in establishing a *prima facie* case of retaliation, the burden shifts back to the defendant to articulate a legitimate, nondiscriminatory reason for its actions, after which the plaintiff may offer evidence to show that the proffered reason is pretextual.

### 2.    The February 22, 2006 Complaint

Plaintiff's February 22, 2006 complaint alleges that defendants purposely excluded her from work during the TWU strike in retaliation for plaintiff's original NYSDHR discrimination complaint. In Wimmer v. Suffolk County Police Department, the Second Circuit held:

19

> To establish the first of these elements—participation in a protected
> activity—[plaintiff] need not prove that the conditions against which [s]he
> protested actually amounted to a violation of Title VII. Rather, [plaintiff] must
> demonstrate only that [s]he had a good faith, reasonable belief that the underlying
> challenged actions of the employer violated the law.

176 F.3d 125, 134 (2d Cir. 1999) (internal citations omitted). There is no indication that plaintiff

believed anything other than that her original SDHR discrimination claims were based on

violations of the law.

Turning to the second element, while plaintiff has not shown that Danielle Ruttman, the

supervisor who told her not to come to work during the TWU strike, was aware of her SDHR

complaint, such a showing is not required by the law. See Gordon v. New York City Bd. of

Educ., 232 F.3d 111, 116 (2d Cir. 2000) ("Neither this nor any other circuit has ever held that, to

satisfy the knowledge requirement, anything more is necessary than general corporate

knowledge that the plaintiff has engaged in a protected activity."). It is not disputed that

NYCTA was aware of plaintiff's discrimination complaints. As a result, plaintiff has established

the second element of her *prima facie* case.

As for the third element, whether defendants' conduct constituted an "adverse

employment action," the Supreme Court has interpreted that phrase broadly in the retaliation

context, requiring only that a plaintiff "show that a reasonable employee would have found the

challenged action materially adverse, which in this context means it well might have dissuaded a

reasonable worker from making or supporting a charge of discrimination." Burlington N. &

Santa Fe Ry. Co. v. White, 126 S.Ct 2405, 2415 (2006) (citation omitted). For the purposes of

this matter, the Court finds that plaintiff's allegation that she was wrongfully excluded from

work and lost pay as a result, constitutes an adverse employment action. See, e.g., Bernheim v.

Litt, 79 F.3d 318, 325 (2d Cir. 1996) (finding that allegations of harm to plaintiff's reputation, opportunities for advancement and earning potential, if assumed to be true, would constitute adverse employment action for the purposes of establishing a prima facie claim of retaliation).

As for the final element of plaintiff's *prima facie* claim, "[p]roof of causal connection can be established indirectly by showing that the protected activity was followed closely by discriminatory treatment, or through other evidence such as disparate treatment of fellow employees who engaged in similar conduct, or directly through evidence of retaliatory animus directed against a plaintiff by the defendant." DeCintio v. Westchester County Medical Center, 821 F.2d 111, 115 (2d Cir.), cert. denied, 484 U.S. 965 (1987) (emphasis and citations omitted).

Plaintiff alleges that two other TWU-represented employees were allowed to enter the building during the strike.[8] "A plaintiff may support an inference of race discrimination by demonstrating that similarly situated employees of a different race were treated more favorably." Norville v. Staten Island Univ. Hosp., 196 F.3d 89, 95 (2d Cir. 1999). However, "[i]n order to make such a showing, the plaintiff must compare herself to employees who are *similarly situated in all material respects*." Id. at 95 (emphasis added) (quotation omitted). Defendants insist that the employees identified by plaintiff, Herbert Bomar and Ron Haynes, are not similarly situated since they are both Rapid Transit Operations (RTO) employees who do not report to Danielle Ruttman. Defs.' Mem. Supp. Mot. Sum. J. 22. Defendants point to Ruttman's statement that the

---

[8] Plaintiff raises this argument in order to demonstrate that defendants' proffered non-discriminatory reason is pretextual. Pl.'s Aff. Opp. Mot. Summ. J. 14. Disparate treatment may be used to argue pretext. See e.g. McDonnell Douglass, 411 U.S. at 793 (noting that a showing of differential treatment toward similarly situated plaintiffs of a different race could suffice to demonstrate pretext). As with defendants' argument referred to in footnote six, the Court chooses to address this claim in the *prima facie* context, without precluding its relevance to any claim of pretext.

individuals in question were employed by RTO and that she was unaware of who they reported to, Ruttman Dep. 25-26, and Brenda Coleman's affirmation which states in pertinent part her understanding that Bomar is not a Law Department employee and does not report to Ruttman, Coleman Aff. ¶ 11. Plaintiff responds simply by stating that "Mr. Bomar [is] assigned to the Law Department within the Torts Division," a statement which is not denied by defendants but does not disprove in any way the proffered differences in situation.

In the instant case the earliest possible date of retaliation is December 19, 2005—the date of the claims meeting in which plaintiff was allegedly told that she was no longer permitted in the building. This action took place more than six months after plaintiff filed her first NYSDHR discrimination complaint. Because this long delay stands on the outer edge of the time-span recognized by the Second Circuit as implying a causal connection,[9] and because plaintiff has failed to provide any other credible evidence of causality, the Court finds that plaintiff has not made out a *prima facie* case of retaliation.

---

[9] The Second Circuit "has not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the exercise of a federal constitutional right and an allegedly retaliatory action." Gorman-Bakos v. Cornell Co-op Extension of Schenectady County, 252 F.3d 545, 554 (2d Cir. 2001). Courts have found that allegedly retaliatory actions taking place anywhere from several days to a couple of months after the protected activity's occurrence may be sufficiently suspect to constitute a "causal connection." See e.g. Reed v. A.W. Lawrence & Co., Inc. 95 F.3d 1170, 1178 (2d Cir. 1996) ("a mere twelve days"); Cifra v. G.E. Co., 252 F.3d 205, 217 (2d Cir. 2001) ("just 20 days"); Quinn v. Green Tree Credit Corp., 159 F.3d 759, 769 (2d Cir. 1998) (less than two months). In Hollander v. American Cyanamid Co., 895 F.2d 80, 85-86 (2d Cir. 1990), however, the passage of three months, without other evidence, was deemed too long to suggest a causal relationship between complaint and failure to provide a good recommendation. Nevertheless, In DeCintio v. Westchester County Medical Center, 821 F.2d 111 (2d Cir. 1987), the court found a firing that took place one year after a protected activity constituted a casual connection (though in that case plaintiff also provided some direct evidence of disparate treatment).

Even if plaintiff had met her burden of establishing a *prima facie* case, defendants have offered nondiscriminatory justifications for the allegedly retaliatory actions. Defendants contend that plaintiff was "one of approximately 38,000 employees represented by the TWU who did not come to work on December 20 and 21, 2005 and who were assessed the Taylor Law penalty." Defs.' Mem. Supp. Mot. Summ. J. 21. They further claim that Ruttman's action stemmed from her belief, based on a prior conversation with non-identified NYCTA personnel, that TWU members would not be permitted in the building during the strike, id. at 10, n. 10; that when she learned that other TWU members had been allowed into the building, she promptly requested that Mr. Francese inform plaintiff that she could come back to work, id.; and that, after being notified, plaintiff returned to work the next day, id. at 11.[10]

Plaintiff alleges that these justifications are pretextual and points to the disparate treatment received by Messrs. Bomar and Haynes as evidence thereof. For the reasons already explained above, however, the Court finds that plaintiff has failed to provide any evidence that defendants' proffered nondiscriminatory reason for the allegedly retaliatory action—Ruttman's belief that as a TWU-represented *MaBSTOA employee under her supervision*, plaintiff was not allowed in the building during the strike—is pretextual. Therefore plaintiff's first claim for retaliation is dismissed.

### 3. The April 11, 2006 Complaint

In her second complaint, plaintiff alleges that she was retaliated against because she was not interviewed for two claims fraud investigator positions. The Court notes the liberal standard

---

[10] The Court also notes that plaintiff was eventually refunded her salary for the days missed as a result of this incident.

for adverse employment action set out by the Supreme Court in White, 126 U.S. at 2415, and the fact that "not every unpleasant matter short of [discharge or demotion] creates a cause of action for retaliatory discharge. Because there are no bright-line rules, courts must pore over each case to determine whether the challenged employment action reaches the level of 'adverse.'" Wanamaker v. Columbian Rope Co., 108 F.3d 462, 466 (2d Cir. 1997) (citing Welsh v. Derwinski, 14 F.3d 85, 86 (1st Cir.1994)) (modification in original). Because a reasonable employee could find the failure to promote to be a materially adverse action, we proceed to the final element of plaintiff's *prima facie* case. Plaintiff applied for the first of these positions on October 19, 2005, approximately three months after her first NYSDHR complaint. This timing creates a presumption of causation sufficient for plaintiff to establish a *prima facie* case of retaliation. See Note 8, *supra*.

With regard to both positions at issue in plaintiff's second complaint, defendants claim that they hired candidates with "far superior qualifications." Defs.' Mem. Supp. Mot. Sum. J. 19. According to James Manning, the Director of the Special Investigations Unit, who was in charge of hiring for both positions, the individual hired for the Supervisory Claims Fraud Investigator position, Harry "Hank" Strawn, had: a bachelor's degree; done graduate work in psychology; gone to law school; been a captain in the Army; done undercover work as a Special Forces operative; foreign language skills; and over ten-years of experience supervising claims fraud and no-fault fraud for a private insurance carrier. Manning Dep. 33.

With regard to the second position (Claims Fraud Examiner), Manning testified that the individual hired, Kenneth Lauber:

24

has a bachelor's degree . . . has about 15 years in at the Transit Authority. He has
done trial prep work for large cases within the torts division. He had a broad
depth of knowledge of the operations of the Transit Authority and of the multiple
departments within the Transit Authority. We felt he was qualified.

Id. at 33-34. Finally, when asked by plaintiff why she was not interviewed for these positions,

Manning responded: "In comparison with the other candidates that were available at the time, I

didn't feel it was necessary to interview you." Id. at 34.

Plaintiff responds to these claims by stating: 1) that the JVNs for the two positions did

not state that Manning "was looking for these specific qualifications," and 2) that she had been

interviewed once before for a similar position in the same unit several years earlier. Pl.'s Aff.

Opp. Defs.' Mot. Sum. J. 21. The first of these arguments is unpersuasive. It can hardly be

expected that a one-page job description will provide an exhaustive list of the qualifying

attributes an applicant might possess. Furthermore, both JVNs specifically required "a

baccalaureate degree from an accredited college with a major in the field of Criminal Justice or a

related field." It is undisputed that both Strawn and Lauber had bachelors degrees, while

plaintiff did not. As for plaintiff's second contention, it was convincingly addressed by Mr.

Manning in his deposition:

Q       [Mr. Gonzales] was interviewed before, right?
A       Several years ago, yes. But the unit was in a different stage at that time. It was a
        different unit.
Q       What do you mean different unit?
A       It was in its infancy. It was much smaller. It was still under development. It was
        still exploring what was available within the agency in order to build the unit.

Manning Dep. 34.

Once again, plaintiff has failed to rebut defendants' proffered non-discriminatory

justifications for its allegedly retaliatory actions. See e.g. Schwapp v. Town of Avon, 118 F.3d

25

106, 110 (2d Cir. 1997) (noting that in a Title VII claim, "a plaintiff must provide more than conclusory allegations of discrimination to defeat a motion for summary judgment"). Plaintiff's claims for retaliation based on failure to interview are dismissed.

### 4.    October 11, 2006 Complaint

Plaintiff's third and final complaint alleges retaliatory conduct by defendants based on the fact that the qualifications listed on a JVN for a Claim Specialist position for which plaintiff applied were changed after the fact so that non-NYCTA employees, like plaintiff, were no longer eligible. If true, this would certainly qualify as an "adverse employment action." As for causality, the act occurred less than one month after the filing of plaintiff's second NYSDHR complaint. In addition, the fact that the qualifications were changed in response to plaintiff's queries creates sufficient grounds for the Court to find that plaintiff has established a *prima facie* case of retaliation.

Defendants argue that the original JVN, which listed the position as available to both NYCTA and MaBSTOA employees, was an innocent mistake that was corrected quickly, after plaintiff's inquiries brought it to light. Defs.' Mem. Supp. Mot. Summ. J. 21. Plaintiff responds by noting that past JVNs for the same position contained the same error and insinuating that the timing of the correction, just after she inquired as to the position, suggests that it was done specifically to exclude her. Pl.'s Aff. Opp. Defs.' Mot. Sum. J. 27-29. Plaintiff also observes that the individuals in charge of the posting, Brown and Coleman, "have been in their positions for x (sic) amount of years and it is very hard to believe that their actions were erroneous." Id. at 29. Finally, plaintiff points to the fact that defendants did not take down the erroneous posting after they realized the error as evidence of pretext. Id. at 30.

26

With regard to plaintiff's last claim, defendants assert that the JNV did not need to be re-posted because all applicants had been notified by letter of the necessary changes. Reply Aff. Rhonda J. Moll ¶ 52. As for the remainder of plaintiff's arguments on this point, the Court is not unsympathetic to plaintiff's perception that the retroactive change in the hiring qualifications was, at least to her, suspicious. However, the fact that a civil service list was established for the position at issue as of July, 2003 (three years before the JVN in question), Brown Dep. Ex. 19, together with Brown's testimony that he was first alerted to the contradiction between the information on the posting and the civil service list by plaintiff, Brown Aff. ¶ 11, constitute sufficient evidence to prevent a reasonable juror from believing that the position was ever intended to be open to MaBSTOA employees and therefore that its modification constitutes a specific act of discrimination against plaintiff.

## CONCLUSION

For the reasons elaborated above, the Court grants summary judgment for defendants on all five of plaintiff's discrimination and retaliation claims.

SO ORDERED.

Dated: Brooklyn, New York
     March 31, 2008

s/ Judge Raymond J. Dearie

RAYMOND J. DEARIE
United States District Judge